1997–NMCA–008

932 P.2d 509

Edwin Dean CAWYER, Worker–Appellee,

v.

CONTINENTAL EXPRESS TRUCKING,
and Gibraltar National Insurance Company, Employer/Insurer–Appellants,

Iris PHILLIPS, Worker–Appellant,

v.

CONTINENTAL EXPRESS TRUCKING,
and Gibraltar National Insurance Company, Employer/Insurer–Appellees,

Barbara GONZALES, Worker–Appellant,

v.

CONTINENTAL EXPRESS TRUCKING,
and Gibraltar National Insurance Company, Employer/Insurer–Appellees.

Nos. 16613, 16725, 16729.

Court of Appeals of New Mexico.

Dec. 27, 1996.

Edward Ricco, Paul R. Koller, Jeffrey M. Croasdell, Rodey, Dickason, Sloan, Akin & Robb, P.A., Albuquerque, for Employer Continental Express Trucking.

Jeffrey C. Brown, Law Offices of Jeffrey C. Brown, Albuquerque, for Worker Edwin Cawyer.

Robert L. Scott, Albuquerque, for Workers Iris Phillips and Barbara Gonzales.

## OPINION

WECHSLER, Judge.

1. These three consolidated cases concern the "extra-territorial coverage" provisions of the Workers' Compensation Act. Each Worker was employed by Continental Express Trucking (Continental) as a truck driver. Continental had each Worker sign an employment agreement stating that Arkansas law would govern the resolution of workers' compensation claims. Each Worker was injured outside of New Mexico. Cawyer and Phillips had applied for and received Arkansas workers' compensation benefits before filing their claims in New Mexico. In *Cawyer*, Worker was awarded New Mexico workers' compensation benefits after the workers' compensation judge (WCJ) determined New Mexico had jurisdiction in that case. In *Gonzales* and *Phillips*, Workers' claims were dismissed on Continental's motions for summary judgment.

2. We affirm the award of benefits to Cawyer and reverse the summary judgments granted in favor of Continental and against Phillips and Gonzales.

### Procedural and Factual Background

3. These cases require this Court to consider the application of NMSA 1978, Section 52–1–67(B) (Repl.Pamp.1991), to the choice of law provisions contained in the employment agreements. If the choice of law provisions are not valid or enforceable, Conti-

nental does not challenge the existence of substantial evidence to support the WCJ's findings in *Cawyer* and does not dispute the existence of material factual issues to defeat summary judgment in *Gonzales* or *Phillips*.

4. The employment agreements signed by Workers state:

Since all drivers are paid from Arkansas and all loads are centrally dispatched from Arkansas, the driver agrees to be considered an Arkansas employee for payroll tax and Workers' Compensation purposes. The employer and Employee mutually agree to be bound by the Workers' Compensation law of the State of Arkansas, and it is mutually agreed that regardless of where injury occurred or where disease was contracted, the rights of the employee and his/her, or their dependents shall be governed by the laws of the State of Arkansas and the laws of this state shall be the exclusive remedy against the Employer on account of the injury, disease or death in the course of and arising out of employment.

Gonzales signed a second employment agreement that had the following language in addition to the language quoted above:

Also, the employer and employee mutually agree that any and all workers' compensation claims, filed on behalf of the employee, shall be filed exclusively with the Arkansas Worker's Compensation Commission. The employer and employee agree that no workers' compensation will be filed in any state, forum, or jurisdiction, other than in Arkansas. The employee hereby elects, as the sole and exclusive forum in which to bring, file or litigate any Workers' compensation claim on his behalf, the Arkansas Workers' Compensation Commission.

5. Cawyer was awarded compensation benefits after the WCJ determined that his work was principally localized in New Mexico. The WCJ also found that Cawyer's regular route after the first year of employment and for the two years prior to the accidental injury "was, with the exception of four short special trips," limited to trips departing from Albuquerque, New Mexico, to California and returning from California to Albuquerque, New Mexico. Cawyer testified that he made

those four trips to Arkansas at the special request of Continental and that these trips were not part of his regular route. Continental appeals the award of New Mexico workers' compensation benefits to Cawyer.

6. In *Phillips* and *Gonzales,* the WCJs gave effect to the choice of law provisions in the employment agreements and granted Continental summary judgment based on New Mexico's lack of jurisdiction. Phillips and Gonzales appeal.

7. In *Phillips,* Continental's motion for summary judgment asserted that Phillips worked regularly out of Arkansas and her duties required her to travel regularly in Arkansas. In support of its motion, Continental submitted copies of Phillips' daily driver logs reflecting her trips to Arkansas. Phillips responded by asserting that she worked regularly out of New Mexico and her employment was principally localized in New Mexico. She also argued that her driver logs are unreliable and incomplete in that they do not reflect many of her runs out of New Mexico.

8. Continental made the same assertions regarding Gonzales' travel to Arkansas and also submitted copies of Gonzales' daily driver logs. Gonzales signed an affidavit stating that these logs were not reliable because long-distance truck drivers regularly "doctor" their logs. She also claimed that she drove mainly in New Mexico, Arizona, and California. At oral argument, the parties agreed that the logs in the record would be an accurate reflection of the trips Workers took to Arkansas, although the logs do not show all of the trips Workers took to other places.

*Statutory Analysis*

*Applicable Statutes*

■ 9. Because each Worker was injured outside New Mexico, the "extra-territorial coverage" statutes govern whether New Mexico law applies in a claim for compensation benefits. NMSA 1978, Section 52–1–64 (Repl.Pamp.1991), provides:

If an employee, while working outside the territorial limits of this state, suffers an injury on account of which he or, in the event of his death, his dependents would have been entitled to the benefits provided by the Workers' Compensation Act [this article], had such injury occurred within this state, such employee or, in the event of his death resulting from such injury, his dependents, shall be entitled to the benefits provided by that act, provided that at the time of such injury:

A. his employment is principally localized in this state;

B. he is working under a contract of hire made in this state in employment not principally localized in any state;

C. he is working under a contract of hire made in this state in employment principally localized in another state whose workers' compensation law is not applicable to his employer; or

D. he is working under a contract of hire made in this state for employment outside the United States and Canada.

Section 52–1–67 provides, in part:

A. A person's employment is principally localized in this or another state when:

(1) his employer has a place of business in this or such other state and he regularly works at or from such place of business; or

(2) if Paragraph (1) of this subsection is not applicable, he is domiciled and spends a substantial part of his working time in the service of his employer in this or such other state.

B. An employee whose duties require him to travel regularly in the service of his employer in this and one or more other states may, by written agreement with his employer, provided [provide] that his employment is principally localized in this or another such state, and, unless such other state refuses jurisdiction, such agreement shall be given effect under the Workers' Compensation Act [this article].

We note that the statutes do not preclude a worker from receiving New Mexico compensation benefits merely because that worker has also received compensation benefits in another state. *See* NMSA 1978, § 52–1–65 (Repl.Pamp.1991) (providing for credits for

benefits obtained under the law of another jurisdiction).

### Choice of Law Provisions

10. The parties differ on whether Section 52–1–67(B) allows an agreement specifying a choice of law or is limited to agreements specifying where the employment is principally localized. They rely on conflicting out-of-state cases to support their arguments.

11. In *Rock v. Workmen's Compensation Appeal Board*, 92 Pa.Cmwlth. 491, 500 A.2d 183, 185–86 (1985), the court vacated the dismissal of the worker's claim for Pennsylvania benefits and limited the applicability of its statute, which is virtually identical to New Mexico's, to agreements about where the employment is principally localized. Without explaining its rationale, the court refused to enforce an agreement stating that Ohio law would govern claims and rights regarding workers' compensation and unemployment compensation because the agreement did not provide that the worker's employment was principally localized in Ohio. *Id.* at 185. The court remanded the case for a determination of where the worker's employment was principally localized under Pennsylvania's equivalent to our Section 52–1–64. *Rock*, 500 A.2d at 186; *see also Creel v. Workmen's Compensation Appeal Bd.*, 164 Pa.Cmwlth. 508, 643 A.2d 784, 786 (upholding the denial of Pennsylvania benefits when the agreement included both a choice of law provision and a statement that the employment was principally localized in Indiana; rejecting worker's argument that the facts establish his work was principally localized in Pennsylvania), *appeal denied*, 539 Pa. 657, 651 A.2d 543 (1994).

12. In contrast, the court in *Heater v. Tri–State Motor Transit Co.*, 644 So.2d 25 (Ala.Civ.App.1994), affirmed the lower court's decision enforcing a choice of law agreement that did not specifically state where the employment was principally localized. Again, the discussion was limited, but the court did note that it was not a case in which the employer sought to avoid its obligation to provide workers' compensation benefits and the worker's change of residence to Alabama did not affect the agreement since he continued to travel from state to state. *Id.* at 26–

27. The court also stated that Alabama's legislature intended to allow the parties to confer jurisdiction of the compensation laws of a particular state when a worker travels regularly in more than one state. *Id.* at 27. The court reached this conclusion based on the express language of Alabama's statute, which is materially identical to New Mexico's Section 52–1–67(B).

13. These cases reflect the competing policy considerations of a state's interest in ensuring that its residents enjoy at least the level of compensation adopted by that state and the need for certainty in allowing parties to choose a particular forum in cases in which there is a potential for conflict about what law should govern. *See, e.g., Hammonds v. Freymiller Trucking, Inc.*, 115 N.M. 364, 369–70, 851 P.2d 486, 491–92 (Ct.App.1993); *Webb v. Arizona Pub. Serv. Co.*, 95 N.M. 603, 608–09, 624 P.2d 545, 550–51 (Ct.App.), *cert. denied*, 95 N.M. 669, 625 P.2d 1186 (1981); 4 Arthur Larson, *The Law of Workmen's Compensation* § 87.71 (1996); Robert A. Leflar, *American Conflicts Law* § 160, at 330 (3d ed. 1977).

14. We determine that the New Mexico legislature intended Section 52–1–67(B) to allow for an express agreement concerning choice of law and that such an agreement might be enforceable under the statute even in the absence of any express agreement about where the employment is principally localized. In making this determination, we are mindful that this Court's main objective in reviewing statutes is to determine the intent of the legislature and that, to do so, we look at both the plain language of the statute and the object of the legislation. *See Romero Excavation & Trucking, Inc. v. Bradley Constr., Inc.*, 121 N.M. 471, 473, 913 P.2d 659, 661 (1996); *Dona Ana Sav. & Loan Ass'n, F.A. v. Dofflemeyer*, 115 N.M. 590, 592–93, 855 P.2d 1054, 1056–57 (1993).

15. In reviewing the overall compensation scheme, choice of law appears to be the sole purpose for deciding where employment is principally localized. The language of Section 52–1–67(B) indicates the legislature's intent to allow parties to agree about where employment is principally localized in order

to select what law to apply. Therefore, when Section 52–1–67(B) allows an agreement to determine where the employment is principally localized, it appears to be solely for the purpose of deciding the question of whether New Mexico's law applies under Section 52–1–64.

16. Since an explicit choice of law provision accomplishes the legislative objective of Section 52–1–67(B), we interpret Section 52–1–67(B) to allow an explicit choice of law agreement without an explicit agreement about where the employment is principally localized. Moreover, as Employer argues, a worker is more likely to understand the consequences of agreeing to an explicit choice of law provision than a provision stating where employment is principally localized.

### Regularity of Travel

17. Having decided that Section 52–1–67(B) allows an explicit agreement concerning choice of law without an explicit agreement about where employment is principally localized, the agreements in these cases must otherwise comply with the statute to be enforceable. Employer concedes that Section 52–1–67(B) requires the state of choice to be one in which a worker is required to travel regularly. At least one Worker argues that the state of choice must meet the criteria of Section 52–1–67(A), which defines "principally localized."

18. We read the statute to require the state of choice to be one in which a worker travels regularly, but not to require that state to meet the statutory definition of "principally localized." Section 52–1–67(B) serves a unique function in allowing the parties to agree to the governing law in cases in which a worker is required to travel regularly in more than one state. Under Section 52–1–67(A), the determination of where employment is principally localized is factually dependent on considerations of whether a worker works regularly at an employer's place of business or where a worker is domiciled and spends a substantial part of his or her working time. In situations in which the worker is required to travel regularly in several states in the service of the employer, determining where the employment is princi-

pally localized could prove problematic at best. To accept Workers' argument would render Section 52–1–67(B) merely redundant of Sections 52–1–64 and –67(A). Moreover, the above interpretation satisfies Workers' concern that the state of choice have a reasonable connection to the employment. *See Methola v. County of Eddy,* 95 N.M. 329, 333, 622 P.2d 234, 238 (1980).

19. The question then becomes whether Continental has proved that Workers' duties in these cases required Workers to travel regularly in Arkansas in the service of Continental. *See* § 52–1–67(B); *see also Baca v. Bueno Foods,* 108 N.M. 98, 102, 766 P.2d 1332, 1336 (Ct.App.1988) ("One who seeks relief under a statute has the burden of proving that he comes within its terms"). If not, Continental has failed to establish that the employment contracts identifying Arkansas as the state of choice come within the terms of the statute and its reliance on the choice of law provisions must fail. There is no dispute that the trips to Arkansas were part of Workers' duties and were made in the service of Continental. The focus of this Court's decision must be whether the travel in Arkansas was regular within the meaning of the statute.

20. There appear to be no cases directly on point. By way of contrast, in *Todacheene v. G & S Masonry,* 116 N.M. 478, 484–85, 863 P.2d 1099, 1105–06 (Ct.App.), *certs. denied,* 116 N.M. 364, 862 P.2d 1223 (1993), this Court considered where a construction worker's employment was principally localized under Section 52–1–67(A). In doing so, this Court took into account all the time a worker was employed by a particular employer regardless of the particular employment contracts involved. This Court identified three factors in deciding whether the employment was substantially related to the state including the time since the worker worked in the state, the percentage of time the worker worked in the state recently and on a long term basis, and the expectation and likelihood that the worker would have worked in the state but for the injury. *Id.* at 484, 863 P.2d at 1105.

21. While *Todacheene* may provide some general guidance, as we noted above, the decision of where an employment is principally localized under Section 52–1–67(A) is distinguishable from whether a worker was required to travel regularly in a particular state under Section 52–1–67(B). Therefore, we rely primarily on the common understanding of the meaning of "regular" in applying Section 52–1–67(B). Dictionary definitions of "regular" include "arranged, or ordered according to some established rule, law, principle, or type," and "steady or uniform in course, practice, or occurrence." *Webster's Third New Int'l Dictionary* 1913 (1971).

■ 22. In applying these definitions, we consider the totality of the circumstances of employment in the context of the nature of the business involved in deciding whether a worker was required to travel regularly in a particular state. In doing so, the entire period of a worker's employment is relevant, although the periods of time closest to the time of the accidental injury carry the greatest weight.

■ 23. While we do not propose any mathematical formula, the frequency, consistency, and predictability of Workers' travel in Arkansas are factors to be considered. The parties' expectations about where a worker will be required to travel might also be considered to the extent that these expectations are borne out during the course of the employment.

24. Additionally, a particular percentage of travel in one state as opposed to other states might be relevant. A WCJ could determine that a worker was required to travel regularly in a particular state of choice even if the worker traveled in that state only a small percent of the time and in other states more often. *See, e.g., Monaco v. Montgomery Cab Co.*, 417 Pa. 135, 208 A.2d 252, 256 (1965) (for venue purposes, taxi company regularly conducted business in county although only five to ten percent of its fares were collected in the county and driving within the county did not follow a fixed schedule or route). It might be possible, for instance, to determine that a worker customarily travels in a particular state five percent

of the time and that this travel is sufficiently consistent within the context of an employer's business that it meets the statutory definition.

25. We determine that there is sufficient evidence that Cawyer did not travel regularly in Arkansas to uphold the decision of the WCJ in that case, and that the records in the other cases do not conclusively establish as a matter of law that Phillips and Gonzales traveled regularly in Arkansas as required by Section 52–1–67(B) to uphold the summary judgments in those cases.

*Cawyer*

■ 26. Cawyer had worked for Continental for approximately three years. The WCJ found that Cawyer's regular route was between New Mexico and California with the exception of four short trips to Arkansas during the last two years of his employment. During the first year of his employment, Cawyer's driver's logs indicate that he traveled to Arkansas approximately ten times. The logs show that he was in Arkansas for several days in December 1992, February 1993, August 1993, and October 1993 before his injury in April 1994. Cawyer also testified that, after his first year of employment, he requested to be dispatched out of the New Mexico terminal and run the route between New Mexico and California. He testified that the four trips to Arkansas during the last two years of his employment were exceptional and performed as special favors at the request of Continental.

27. We recognize that the nature of the interstate trucking industry necessarily requires truck drivers to be on the road and to travel to various states depending on what loads need to be transported. The facts in *Cawyer*, however, do not establish the type of frequency, consistency, or predictability of Cawyer's travel to Arkansas that meets the definition of usual or customary travel, particularly during the period of time closest to his injury. Although he traveled to Arkansas almost every month during the first year of his employment, Cawyer had not traveled to Arkansas for at least nine months prior to his injury. His customary route was be-

tween New Mexico and California. There was evidence that the four trips made in the two years prior to his injury were out of the ordinary and made as special favors to Continental.

28. Based on these facts, the WCJ could properly determine that Continental failed to prove that Cawyer was required to travel regularly in Arkansas within the meaning of the statute and, therefore, the choice of law provision in the employment agreement is not enforceable. We affirm the award of New Mexico benefits to Cawyer.

### Gonzales

29. Gonzales traveled to Arkansas approximately ten times during the four or five months of her first employment with Continental. She worked for Continental for over two years after signing the second employment agreement. During the first year of her re-employment, Gonzales traveled to Arkansas approximately thirteen times between March 1992 and January 1993. Between March 1993 and February 1994, she traveled to Arkansas approximately five times. Between March 1994 and her injury in June 1994, she traveled to Arkansas approximately three times.

30. The logs indicate that, on a number of these trips, Gonzales would stop in Arkansas for only a brief time to refuel on her way to another state. While these trips are included in the trips made to Arkansas, they carry less weight than trips when a greater length of time is spent in Arkansas. Gonzales testified that she drove mainly in New Mexico, Arizona, and California. Although this testimony is not conclusive of the issue, it supports a factual question concerning whether Gonzales had a customary or established route and whether the trips to Arkansas should be considered part of her customary travel.

31. While the record in *Gonzales* indicates more frequent travel in Arkansas than the record in *Cawyer*, considering Continental's motion for summary judgment in the light most favorable to a trial on the merits, we determine that Continental has failed to establish that it is entitled to judgment as a matter of law based on the evidence present-

ed. In *Gonzales*, as in *Cawyer*, there was a significant change in the number of trips made to Arkansas after the first year of employment or, in the case of *Gonzales*, re-employment. The logs admitted into evidence in *Gonzales* do not reflect trips she made to other states in addition to the trips made to Arkansas.

32. The record in this case reveals a genuine issue of material fact about whether Gonzales' trips to Arkansas were part of her customary or established travel in the context of the interstate trucking business. We reverse the award of summary judgment to Continental against Gonzales.

### Phillips

33. Phillips worked for Continental for over three years, including some time after her accidental injury. Phillips' driver's logs indicate that she traveled in Arkansas approximately thirteen times during the first year of her employment. During the second year of her employment, the logs indicate that Phillips traveled to Arkansas approximately two times. During the third year of her employment, from June 1993 to the date of her injury in May 1994, Phillips traveled to Arkansas approximately ten times. After her injury, Phillips returned to work for Continental and made approximately five trips to Arkansas between August and October 1994. Phillips signed an affidavit stating that, when she became employed with Continental, she understood she was to drive nationally while residing in New Mexico.

34. As in *Gonzales*, Phillips' driver's logs indicate that some of the trips to Arkansas consisted of traveling through Arkansas, stopping for only a few hours on her way to another state. As in *Gonzales*, the record does not reflect the trips Phillips made to states other than those included in the trips to or through Arkansas. Phillips asserted in her response to Continental's motion for summary judgment that she regularly worked out of New Mexico and that her employment was principally localized in New Mexico.

35. We recognize the theoretical possibility that a worker's employment may be prin-

cipally localized in one state as defined by Section 52–1–67(A) and yet, in situations in which the worker's duties require the worker to travel regularly in more than one state in the service of the employer, the parties may sign a valid contract identifying a different state as the state of principal employment under Section 52–1–67(B). Therefore, Phillips' response to Continental's motion for summary judgment does not directly refute Continental's assertion that she was required to travel regularly in Arkansas.

36. Nevertheless, a genuine issue of material fact exists about whether Phillips was required to travel regularly in Arkansas based on Phillips' logs. The pattern of Phillips' trips to Arkansas as evidenced by her logs varies from thirteen the first year, to two the second, to ten the third, and to five in the few months of her post-injury work for Continental. She traveled to Arkansas less than once a month during the year preceding her injury. The record does not reflect what other trips she may have taken to other states. On this record, Continental has failed to establish that it is entitled to judgment as a matter of law.

37. We reverse the award of summary judgment to Continental against Phillips.

*Conclusion*

38. We affirm the award of New Mexico workers' compensation benefits to Cawyer and reverse the orders granting summary judgment to Continental against Phillips and Gonzales. Our decision in the latter two cases does not preclude Continental from establishing on remand that Phillips or Gonzales traveled regularly in Arkansas within the meaning of Section 52–1–67(B). We hold only that, on the current state of the record, there is a genuine issue of material fact about whether Gonzales and Phillips were required to travel regularly in Arkansas.

39. IT IS SO ORDERED.

PICKARD and FLORES, JJ., concur.